this morning is 19-3014 Little v. The Budd Company. Counsel. Thank you, your honors, and with the court's permission I'm going to try to reserve three minutes, but I'll monitor that myself. Thank you. Good morning, Judge Holmes, and may it please the court. When federal law occupies a field, it preempts state regulation whether or not it's complementary or inconsistent. Here, Congress, given its intensive and significant investment in the intercontinental or transcontinental railroad, as well as its interest in interstate uninterrupted interstate train commerce, has completely regulated and occupied the field of rail vehicle construction and safety. But plaintiff's lawsuit intrudes upon that field and undermines the interest at stake there, and it does so by indicating that the rail car at issue in this case, while consistent with federal law, is unreasonably and unsafe under Kansas state law. Because those duties and obligations are inconsistent, federal law prohibits and preempts the competing state laws in this case, and we ask that this court reverse the district court's judgment. I'd invite the court's questions at this time, but if there are none at this time, I'd like to move first to the LIA. Oh, I have questions, and I'll start with the LIA. Thank you. I have a I've read through every order that the court made and looked at the arguments that you made, and that those arguments related to the insulation in the pipe. They did not relate to the rail car. That is an entirely distinct theory as far as I can tell, and so tell me, help me out here, because I don't see how this argument is preserved. So I'll point you to two specific things first, and then I'll talk about five or three to four more additional things. The first thing is on JA 104 to 107, I believe. We preserved it, and we talked about train wide preemption. The second thing is with regard to the motion for summary judgment, and the JA 104 to 107 is our Rule 12 motion. I think that's the appropriate appellate site or appendix sites. And the second is the summary judgment motion. We talk about train wide preemption in the Rule 12 case, in which we indicate that the entire train rail car is preempted because of that. The second thing I would point you to is a definition of appurtenance in our summary judgment pleading. In both of those pleadings, my recollection of the record is that we predict that the plaintiffs are going to object to the rail car preemption, and the broad preemption that would apply not only to the locomotive, but also to the appurtenance. So throughout the entire proceedings, that that was the theory that you were pursuing? Yes. So every order the district court entered did not relate to the rail car? Yes. So the first order that the district court identified looked at whether or not it was the piping aspect. And then so because it was the piping aspect, well, so then we had to address the piping aspect as the district court created it. The court's obligation is not to pick the theory of the case. It's your obligation. Right, but in the Rule 12 motion, we specifically identified the rail car preemption. And at the time, I'll go get the pleadings, but I believe it's JA 104-107. So I think it's our position that we intentionally did create a broad preemption category, and then the court took what we believe is the Third Circuit decision that looked at whether or not the particular pipe went from the error because I think the Kearns decision, the United States Supreme Court decision, says that you don't look at whether we slice and dice these particular aspects and where they're used. Rather, in that case, I think the locomotive, the brakes were repaired and replaced. I think that's what. So you never brought up the pipes? That was all the district court? No, I think everything about this case is the piping insulation, but the aspect of separating them out and segregating them out from the rail car is a distinction that we make. Because they're part of the rail car, that is, it makes no difference whether or not they were connected to the locomotive. Well, is there anything in the record where you're correcting the district court or complaining you've misunderstood our theory? I don't think there's anything that there is a correcting or misunderstood. I think the entire time, we're asserting that under the Kearns decision, the only difference here is that the rail car is an impertinence. I don't think that we would indicate that a rail car, or I'm sorry, piping beneath a rail car is an impertinence because it's to a locomotive. Rather, the entire train operates in one and the same. So you're not saying that your theory below was that this piping connected to the locomotive and because it connected to the locomotive, it therefore, it therefore, was an impertinence. So I think how I would characterize it is we asserted initially a broad view and the district court said, well, you know, like the Third Circuit, it matters whether or not the piping is connected from the locomotive to each particular rail car. And so we said, well, okay, if you're going to do that, it was. But our point is that we didn't have to say, judge, you're wrong. This is a bigger rail car. Remember how we pointed out on JA 104? Why didn't you? Because the court denied you relief on motion for dismiss, denied you relief, right, on the motion for summary judgment. Well, if the court denied you relief on a wrong theory, then shouldn't, wouldn't you be incumbent upon you at some point to tell them, no, your honor, your theory is wrong. That's not what I'm arguing. Sure. I think, I think that is a possible way to go about litigating a case, but sometimes I would read a judge of like, listen, the judge is going to go this way. I've made my argument. I think I can still win as the judge is kind of inclined to go to. And so I think, I think the way the, this case was litigated below is even if you want to look at a pertinence, the record would indicate that they are connected. But I don't think that makes sense in the Kearns decision because at the point these, that Mr. Rabe was working on these rail cars, it wasn't connected to a railroad. Much like the locomotive brakes wasn't on the railroad when the plaintiff in that case was working. Rather, the incident is a train. It's designed to be put on a track, just like the locomotive in Kearns, the rail car in this case, is designed to be on a trail, a track, and it's an appurtenant to the locomotive interstate rail transportation. Because it's connected to it? Well, ultimately. Connected to the locomotive? Ultimately, the trains are all connected, yes. But whether or not the incidence of a pipe being attached to the locomotive as opposed to at the coupler is immaterial to our argument, I think, because what Congress was designed or what Congress intended the rail car regulations to do is to promote uninterrupted interstate rail transportation. Whether or not a particular pipe was connected from a locomotive to something else doesn't matter because the ultimate purpose isn't connection of pipes. Rather, it's the movement of uninterrupted interstate rail transportation. Well, you're not getting that from Supreme Court authority. You say Kearns, but that involved a brake shoe that's connected to the locomotive. So it actually was a part of the locomotive. Exactly. And so that's why we believe that the proper terminology to look at here is an appurtenance. And what is the definition of appurtenance? As Congress used it in 1913, an appurtenance is an appendage to a locomotive or train. So you're saying a brake shoe is the same thing as a rail car? So a brake shoe on a rail car, I would point you to Judge Robreno's decision in the Eastern District of Pennsylvania, indicated that that was part and parcel of the train. Whether it was connected when it was worked on or not didn't matter. Rather, the import of Congress is the regulation of uninterrupted interstate rail transportation. And so that's why we believe the definition of appurtenance is important. What if we search the record and we don't agree with you? Then where are we? So I would also point, I think I mentioned the summary judgment, and I'll have the appendix when I come back. But I would point to the preemption in the answer pretrial order and post-trial motions as well. But I'll get those to you. So I think if you don't agree with me on the LIA, then you go to the SAA, the Safety Appliance Act. And I think our understanding of Southern Railway, as well as the Guilfrey decision, is that that is an occupation of the field that would exclude state regulations. What do you do then with the Supreme Court's Terminal Railroad Association, where the court held that the state of Illinois was not preempted from regulating whether a caboose was attached to the locomotive? I mean, and in both instances, what you were talking, so it goes to the point was that it was for a safety purpose, and a safety purpose that was not specified in the SAA. So if the state could regulate whether a caboose would be attached to the locomotive, then where does that get you for both of those statutes? So a couple of things. One is I think that is a train construction in constructing what cars are involved, not whether or not a rail car, locomotive, or anything else can be on the tracks. I think the language of the SAA is important. It says rail carriers can use, in the SAA it's rail cars, trains, and whatnot, on the tracks if they have these minimal safety devices. So it may be used. Now, whether that state could then add an additional train construction, and I'm using it not in the building sense, but rather as in the number of cars and what types of cars they are, if they can use that in the construction focus, that would be something that's outside of the safety. If the state was adding a caboose for safety purposes, it was my understanding your position under SAA would be that they can't do that because the area of federal railroad safety is preempted by the SAA. Is that not right? So I think that it is preempted up until the FRSA was enacted, but I don't believe that train construction is something that would fall within the Safety Appliance Act, and again, I'm using construction in the sense of building the train with multiple cars, not in creating a rail car. So I think that's the distinction I would draw there. I would point the court to the Southern Railway and Gilvory decision, which recognizes a broad field, and I think some of the courts... Well, in those cases, was it in fact the case that they were dealing with something that wasn't specified in the SAA? So in each of those cases, I believe they were a specific item listed in the SAA. Well, that doesn't help you then. That broad language is dicta then. So it does help me because the specifics of the SAA, it's doing two things. One is it's saying trains can be on the tracks if they have these minimum safety devices, and there's absolute liability if any of those things are incorrect, but what it also says is this is the minimum floor that Congress has regulated to. It doesn't invite additional and complementary or consistent safety activities from the states. Rather, Congress has occupied a broad field, and I think that's what Southern Railway, as well as Gilvory, recognize is a broad preemptive power that it would exclude additional state interventions, saying you need to have three guardrails instead of two, or in this case, you need to have a particular piping insulation, because look at the result of the competing laws, and I see I'm getting close to three minutes, so I'm going to wrap up. Each state would have competing laws with regard to what their views on safety and environmental security are, and it would throw a patchwork of regulations onto the trails which would interrupt the uninterrupted interstate rail transportation. So I think the Terminal Railroad Association, I think that was a terminal, whether or not it was interstate I think is subject to dispute, but that's how I'd read it. Unless the court has any questions, I'd probably reserve the balance of my time, and I'll go look for those signs. Thank you. Good morning, Your Honors. John Roven for the Raib family. May it please the court, in 1897, four years after President McKinley signed the first Safety Appliance Act into law, the Supreme Court upheld New York's safety regulation of passenger car heating equipment. Exactly this is very subject matter of this case. Rejecting a uniformity argument, Justice Harlan stated the following words, Council for the Railroad suggested that to stop an express train on its trip from New York to Boston, in order that the passengers have the car heated as required by New York, would be a hardship on travel that could not be endured. But these possible inconveniences cannot affect the question of the power of each state to make reasonable regulations for the safety of interstate trains, so long as Congress deems it wise not to establish regulations on that subject that would displace any inconsistent regulations of the states covering the same ground. New York, New Haven, and Hartford was heavily relied on by the Supreme Court in its first preemption decision that squarely addressed the SAA, and that was ACL versus Georgia. There, the state of Georgia had imposed a headlight requirement to stand, the Supreme Court said, said it again, quote, if there appears to be need of standardization, that remedy does not rest in the denial to the states, in the absence of conflicting federal action, of their powers to protect life and property, but rather in the judgment of Congress when it pleases to create the rule and make the standard to be The term covering was also selected by Congress when it passed the Federal Railroad Safety Act in 1970, which is a far more comprehensive safety act than either of these two old statutes. That act has an express preemption provision, and in CSX versus Easterwood, the court said that that term covering, which is a solicitude towards state law, and permits preemption only when the state action is, quote, substantially subsumed by the federal law. So Bud has it backwards. The Safety Appliance Act will certainly preempt any state standard that infringes on ground that it covers, but the SAA preemption thesis on which it relies, which is the alleged pervasive federal regulation of rail car equipment, is simply devoid of historic proof. In fact, what they're really arguing is a dormant commerce clause of the type that was rejected in New York New Haven. Now, the Southern Railway case, it was a straightforward decision. It prohibited a state from exacting penalties for an SAA violation, which was a broken grab iron on a rail car. The SAA, of course, regulated grab irons, and it already had a penalty provision in the SAA. But the notion that Southern Railway somehow silently overruled Atlanta Coastline, which was decided the year before, ignores Southern Railway's own test. This was the words of the Southern Railway court. The test is not whether the state legislation is in conflict with the details of the federal law or supplements it, but whether the state had jurisdiction over a subject on which Congress has exerted its exclusive control. And we know, of course, that from New York New Haven, the states had plenary authority over passenger car heating. They already had it. So reading Southern Railway in the way that Bud is, is of course overreaching. They have also agreed, below of course, that there was never a federal standard for pipe insulation, and that's in the appendix of page 280. When the SAA's standard of care applies, of course it's absolute. The failure of a statutory device to function creates absolute liability, and regardless of the assiduous care of the railroad. And this court recognized that in the Miller case, recognized that a motorist would have a cause of action under state law for violation of the SAA. And the act has to be liberally construed in favor of those it protects, but the subject matter of the act it covers can't exceed the intent of Congress, because to do otherwise would improperly expand the penal statute. There are civil penalties under SAA. So if we say that SAA covers everything that has to do with safety, then does the U.S., does that mean a U.S. attorney is able to go prosecute the railroad and say that there was an SAA violation because this this particular part has something to do with safety? We can't expend a penal statute in that manner. So too with tort actions. Justice Van Deventer, who was then on the Eighth Circuit in U.S. versus ATSF, which is improperly would be deemed a violation in a civil penalty action, would also be a violation for personal injury. So it simply makes no sense to split the coverage of the SAA. We can't do it. The subject matter is the subject matter. It makes no sense to take a 130-year-old statute and have it handbrakes, power brakes, handholds, grab irons, sill steps, ladders, running boards, and automatic couplers. That is all that the Safety Appliance Act has ever regulated. That's why in Napier, Justice Brandeis said that the act is an act of limited scope and coverage. If SAA now includes any rail card device that arguably pertains to safety, then somebody injured, for example, by a boxcar brace rod would have a claim for SAA violation by virtue of the fact that device is an appliance intended for the safety of employees, which is the old title of the original act. But that device, the brace rod, is exactly the device found not to be within the scope of the SAA in the Scarlett case in 1937. That's not a preemption case, though, is it? It is not, Your Honor, but it specifically says that only those devices that fall within the act are actionable. And Justice Vandeventer told us that the scope of the act is the scope of the regulatory field. So in quite clearly said that its pipe covering was a safety appliance. That's at 705. But the material specifications, which it produced in this case, which designate all of the included safety appliances that were sold on the rail car, does not include asbestos or pipes or pipe covering or the like. Instead, they simply designate the same eight devices that SAA has already regulates. And if asbestos was somehow a safety appliance, why wasn't it on the list? Today's passenger equipment safety standards contain their own preemption regulation, which is at 49 CFR section 213. With the exception of locomotive equipment, which of course is subject to Napier and Kern sweeping preemption, it's the same rubric for rail car devices that was announced by Judge Harlan in 1897, that if the federal government does not enact a regulation covering the device, that state requirements may continue. State standards for rail cars are not preempted until there's a covering regulation. New York, New Haven, and Hartford endures today. I want to speak just for a moment about the issue of waiver, Your Honors. On 12C, on the 12C motion, Bud specifically disclaimed that it was moving for LIA preemption. That's in the appendix at page 215. The only reason that the Kerns case came up was because they were trying to conflate it, and they were trying to say that Kerns governed the decision in this case. But they specifically disclaimed asking for LIA preemption in the 12C motion. At summary judgment, Bud said the following, verbatim, quote, 707 in the appendix, Bud does not assert that the rather, it asserts that the main steam line was designed to form a locomotive appurtenance. This is what they argued. Was plaintiff not entitled under the diligence requirements of the federal rules of civil procedure and the disclosure requirements to rightly rely on that? What were we, I mean, we beat the connection theory at trial. Do we have to fight another theory on appeal? The steam pipe interconnection theory was the same thesis advocated by their company's president, Mr. Bastien. His testimony, his affidavit is discussed in the court's order denying summary judgment at 833. Apparently, though, that is an abandon on appeal. They're no longer arguing it. So, in favor of this new one. I think it's important for the court to understand just briefly that the diagnosis of malignant mesothelioma was not contested in this case. Either was causation. Plaintiff was granted partial summary judgment by the court, and that's that issue is not before the court today, but the reason that I bring it up is because at trial, Dr. Victor Rogli, who's a pathologist from Duke, explained that the product that they chose to use on these car pipes, called woven stone, was about a hundred times more carcinogenic than conventional chrysotile asbestos. Dr. Rogli's testimony begins in the appendix at page 1454. He also testified that persons working with that, with woven stone, in uncontrolled dusty conditions like under a rail car, double their risk of mesothelioma in just a few months, if not less. Mr. Ray worked around this stuff for 30 years, so the jury heard evidence that his risk of mesothelioma doubled and redoubled and redoubled exponentially. Now, as we know from the record, Bud's rail cars had three types of piping. Steam, air conditioning, and water. Two of those three pipings, water and the air conditioning, had no connection to locomotives, not even theoretical connections. Mr. Ray was exposed to them, too. That's an uncontested fact in the record. It's 838, the joint appendix. And a schematic that shows how close those pipes are to one another when you're working under a rail car is shown in Plaintiff's Exhibit 354, which is at our supplemental appendix at page 5. So in light of this evidence, we knew that a trial, there would be plenty of evidence that Mr. Ray was exposed to asbestos on pipes that were never even connected, or not even theoretically connected to a locomotive. In fact, one of the... I'll move on, Your Honor. But prior to trial, Bud stipulated that it was their burden to do so. Of course, as the court is aware, a 50-A motion was never made at the conclusion of the plaintiff's case, either. So, of course, here, even on 50-A, 50-B, after judgment, Bud again described its LAA preemption thesis as pertaining to, quote, steam lines running under the rail cars connected directly to locomotives. That's at the appendix at 1596. So, the judge's ruling on 50-B was not on this defense. It wasn't on the preemption theory. Your Honor, having met and defeated the steam line interconnection theory, the plaintiff should not be required to fight another theory on appeal. Of course, we never know what the court will decide to do. Should the court decide to reach the merits of the LAA whole rail car theory that they're arguing now, there are five distinct reasons why it's a bad argument. Number one, Your Honor, Garcia versus Burlington Northern, saying rail cars are not locomotives. If rail cars are somehow appurtenances, then it would render Garcia meaningless. Number two, this court's decision, of course, in Straub. In Straub, the court explained that, quote, only if it is integral or essential to a completed locomotive. Your Honor, I'm out of time. Thank you, counsel. I would point the court first to joint appendix, page 105, where Budd argued the LAA has broadly preempted from state regulations, quote, the entire field of regulating locomotive equipment, close quote. Together, these statutes preempt the field of state regulation over locomotives and rail cars. In addition, I would point the court to pages 273. But that was your collective theory. That was the theory that the LAA and the SAA together collectively preempted the field. That's not talking about a rail car, the specific LAA preemption derived from the rail car and its connection to the locomotive. Those are two different things. So the statutes are different, but I think the argument was in particular to the LAA. And that's what I understood your question. I understood you to say that that argument was that collectively the LAA and SAA preempted the field, a collective argument. And the district court in its, I think, response to the motion to dismiss said, well, you know, two plus two, you know, you don't get any more if you don't preempt this, you don't preempt that. The sum is not greater than the parts. Right. So leaving aside the collection of those, I think the specific thing is in our LAA, we addressed it with regard to, I would point the court to that provision. I would also point it to the summary judgment pleadings that started about Appendix 273 through 277. So where we were specifically talking about not just rail car, but also interconnected piping system. Anything with regard to the piping system that's going to be repaired or manufactured, much like the brake shoes in Kearns or the brake shoes in the Perry decision from the Eastern District of Pennsylvania, it doesn't matter how they're connected or whether they're connected. Rather, it matters whether or not they're a locomotive appurtenance. And the definition of appurtenance is broad enough to include the rail car, the piping within the rail car, or other items on that rail car. And that's the whole purpose is the court, the district court needed to look on a textual basis whether or not the rail car or even the piping system is an appurtenance to a railroad. Kearns dealt with a part of a locomotive. This deals with an appurtenance. That's why we believe the district court failed to look at the text and apply the text to the item at issue in this case. And I'm out of time, but I'd love to talk more. That's it. Thank you. Case is submitted. Thank you both, counsel, for your helpful arguments.